26 F.3d 948
 1994-1 Trade Cases P 70,617
 HARCOURT BRACE JOVANOVICH LEGAL AND PROFESSIONAL
PUBLICATIONS, INC., Plaintiff-Appellee,
v.
MULTISTATE LEGAL STUDIES, INC., Defendant-Appellant.
HARCOURT BRACE JOVANOVICH LEGAL AND PROFESSIONAL
PUBLICATIONS, INC., Plaintiff-Appellee,
v.
MULTISTATE LEGAL STUDIES, INC., Defendant-Appellant.
 Nos. 92-56488, 93-55324.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1994.
Decided June 8, 1994.
 
 Robert Fabrikant, Sidley & Austin, Los Angeles, CA, for appellant Multistate Legal Studies.
 Joseph Wheeler, Kenneth M. Fitzgerald and Roman Lifson, Latham & Watkins, San Diego, CA, for appellee Harcourt Brace.
 Appeal from the United States District Court for the Southern District of California.
 Before: HUG, WIGGINS, and NOONAN, Circuit Judges.
 Opinion by Judge NOONAN.
 NOONAN, Circuit Judge:
 
 
 1
 In these consolidated appeals Multistate Legal Studies, Inc. (Multistate) appeals a finding that it is in contempt of a consent decree arrived at in litigation with Harcourt Brace Jovanovich Legal and Professional Publications, Inc. (Harcourt). It also appeals its failure to obtain a contempt judgment against Harcourt and the award of sanctions against itself for the attempt. We affirm the judgment of the district court, except as to the sanctions.
 
 FACTS AND PROCEEDINGS
 
 2
 Harcourt has for 25 years conducted bar examination review courses throughout the United States. It uses the name Bar/Bri for its program covering the entire examination. It also offers the Gilbert Multistate Seminar to prepare applicants for the Multistate Bar Examination or MBE, which is part of the bar examination in most states. Multistate is Harcourt's principal competitor in preparing students for bar examinations. It offers an MBE review course under the name PMBR Course, and in California it sells a bar review course for the entire California Bar Examination.
 
 
 3
 In October 1990 Harcourt filed suit in the federal district court against Multistate charging it with false and misleading advertising in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a), and with unfair competition, trade libel and interference with prospective economic advantage. The district court entered a temporary restraining order and then a preliminary injunction against Multistate using the advertisement complained of. Multistate was also ordered to publish a corrective statement conveying truthful information about the two programs. Multistate did not appeal. It did, however, counterclaim against Harcourt, charging it with false advertising, trade libel and unfair competition.
 
 
 4
 Ultimately the parties agreed to the district court entering a "Judgment By Consent." The judgment provided that Multistate would pay Harcourt $50,000, would not further circulate the advertisement complained of and would circulate the corrective statement. Harcourt was also ordered to circulate a corrective letter. The consent decree then ordered the parties to refrain from certain conduct as follows:
 
 
 5
 6. HARCOURT and MULTISTATE, their agents, franchisees, and subsidiaries, are ordered not to disparage the products of the other, but truthful, accurate, and non-misleading comment is permissible. In addition:
 
 
 6
 (A). With respect to each party's California full service course:
 
 
 7
 1). Neither party shall refer to the other by name (or such other description which makes its identity known) in any printed material (ads, flyers, brochures, etc.) which it posts or disseminates by any fashion.
 
 
 8
 (B). With respect to each party's Multistate Bar Examination ("MBE") courses:
 
 
 9
 1). MULTISTATE shall not refer by name (or such other description which makes its identity known) to any MBE supplemental course offered by HARCOURT (at this writing those courses are Gilberts, HarBrace, and HBJ) in any printed material (ads, flyers, brochures, etc.) which MULTISTATE posts or disseminates by any fashion.
 
 
 10
 2). However, MULTISTATE may refer by name to Bar/Bri's full service course to the extent that such reference is limited to truthful statements to the effect that the PMBR is a valuable supplement to the Bar/Bri course, and that Bar/Bri students find it beneficial.
 
 
 11
 3). HARCOURT (and its subsidiaries, including but not limited to Bar/Bri, Harbrace, HBJ, and Gilberts) shall not refer by name (or such other description which makes its identity known) to the PMBR Multistate course in any printed material (ads, flyers, brochures, etc.) which HARCOURT posts or disseminates by any fashion.
 
 
 12
 (C). With respect to HARCOURT'S, its franchisees', and subsidiaries', full service courses outside the State of California, they shall not refer to the PMBR Multistate Course by name (or such other description which makes its identity known) in any printed material (ads, flyers, brochures, etc.) which they post or disseminate by any fashion.
 
 
 13
 1). In certain states HARCOURT has granted licenses to third parties to conduct full service bar review courses in those states. To the extent that such license agreements provide HARCOURT with the power to require those licensees to comply with the terms of this Consent Judgment, HARCOURT shall require such compliance. To the extent that such licenses do not empower HARCOURT to require such compliance, HARCOURT shall use its best efforts to obtain compliance by such third parties.
 
 
 14
 7. The terms of this Judgment, the settlement reached in the action entitled National Conference of Bar Examiners vs. Multistate Legal Studies, Inc., Civil Action No. 90-1471 (E.D.Pa.), as well as the prior orders and findings of this court, are to remain confidential and shall not be disclosed by the parties to their campus representatives or potential or actual enrollees in any bar review course. However, disclosure to one's own insurance carrier is permissible.
 
 
 15
 The order of the district court was entered April 16, 1991.
 
 
 16
 On October 13, 1992 Harcourt moved for a finding of contempt by Multistate in violation of this order, submitting five ads that it contended violated the court's order. The ads run by Multistate were as follows:
 
 
 17
 One: A flier with a large headline: "Don't Kid Yourself. There's No Comparison," under which in the left hand column were pictures of Multistate's workbook and a declaration that its students "have achieved the highest MBE scores in many jurisdictions." In the right-hand column was a reproduction of Gilbert Law Summaries Multistate Bar Examination and beneath it the statements: "No reported MBE scores! No successful track record! Simplistic questions that will give you a false sense of security!"
 
 
 18
 Two: A flier headed: "Is Bar/Bri Really Adequate For The MBE?" Beneath that headline were two statements, that the mean raw score on the 1991 Multistate Bar Exam was 117 correct and that the overwhelming majority of students taking it were enrolled in Bar/Bri. These statements were followed with a query: "What was the MBE mean score of Bar/Bri students?" Beneath this emphasized presentation the rest of the sheet was taken up with a comparison between columns headed by Multistate's workbook on the left and Gilbert Law Summaries Multistate Bar Examination on the right. Multistate was described as "the innovator" and Gilbert as "the imitator." Beneath Gilbert's there appeared the following: " 'Waste of valuable time': General consensus among students taking the July 1992 Multistate Bar Exam."
 
 
 19
 Three: A flier headlined, "The Verdict Is In," beneath it the statement: "Our competition is guilty of misrepresentation for non-disclosure. Here's the facts they're trying to hide." The so-called facts that followed made the claim that certain instructors of the competition had either never taken the MBE or never passed the California Bar Exam. The reader was asked: "Do You Want Non-California Attorneys Preparing You For The California Bar Exam?"
 
 
 20
 Four: A flier captioned at the top: "The Reason Why," supplemented at the bottom in large letters with "Over 10,000 Bar/Bri Students Will Supplement With PMBR!" This headlined message surrounded a letter from a lawyer to Multistate which, in part, stated, "Bar/Bri is a good 'outline' course; but I was lulled into thinking that learning 'black-letter law' (for the first time) would be enough to pass." As a consequence the lawyer stated that she had been seriously disappointed and had turned to the Multistate course which had been of substantial help.
 
 
 21
 Five: A form letter beginning "Dear Prospective Bar Examinee," again stating the mean raw score on the 1991 MBE and that the overwhelming majority of those taking it had taken Bar/Bri, whereas a survey of Multistate students showed an averaged scale score 31 points higher.
 
 
 22
 The district court found these ads to have violated its decree and ordered Multistate to withdraw them and to pay Harcourt $19,967 in attorney's fees and costs.
 
 
 23
 On November 6, 1992 Multistate moved to hold Harcourt in contempt. Multistate cited an advertisement run in Ohio by the Ohio Practice Institute, a company that was an affiliate of Harcourt. In addition it cited a flyer distributed by Harcourt that stated the following: "Yesterday--'The Game': 'Repeat' Questions." Under this large caption it was stated: "Historically, the best rationale for most students taking a supplemental MBE workshop was to review 'repeat questions.' " In large caps the ad then said "BAR EXAMINERS CHANGE THE 'GAME.' " A final headline declared: "TODAY--THE GILBERT METHOD," beneath which followed: "Today, memorizing repeat questions no longer works. You must have sophisticated 'Multistate methodology.' Only Gilbert delivers this!!!"
 
 
 24
 In addition, Multistate submitted the declaration of its president, Robert Feinberg, that he had received a telephone call on October 26, 1992 from Cynthia Williams "who identified herself as a campus representative employed by Harcourt's Bar/Bri at Pepperdine School of Law" and that she had told him that at a meeting of Harcourt campus representatives, Bar/Bri's California director, Brian Sax, had told the representatives that Multistate "had to revise and alter its course materials as a result of the lawsuit with the National Conference of Bar Examiners" and that as a result Multistate's program was "no longer effective or worthwhile in preparing students for the MBE." Feinberg stated that from his experience in the bar review business he knew that "this speculative (and false) information" was intended to be circulated by Harcourt to its reps.
 
 
 25
 The district court found that Harcourt was not in contempt and granted Harcourt's motion for Rule 11 sanctions against Multistate.
 
 
 26
 Multistate appeals the judgment of contempt against it and the award of attorney's fees, the judgment finding Harcourt not in contempt, and the judgment of sanctions.
 
 ANALYSIS
 
 27
 Violations of the Consent Decree by Multistate
 
 
 28
 There can be little dispute that the first two advertisements run by Multistate disparage the product of Harcourt and so violated the exact terms of the judgment of the district court. Multistate makes the weak argument that references to Gilberts are not references to what Harcourt offers but to "an unrelated series of legal outlines published separately by Harcourt as part of a business line that is distinct from its bar review offerings." The point is a quibble. Gilberts is the way the bar review course is known. No ordinary reader of the ad would distinguish the Gilbert Law Summaries Multistate Bar Examination volume, which was pictured, from the course. Multistate argues that the district court first had to take evidence of consumer reaction. There is a point at which common sense may proceed without specific evidence. In the case of these ads the references to Gilberts was sufficient to identify the Harcourt bar review course that was being disparaged.
 
 
 29
 The third ad referred only to "our competition" in accusing it of misrepresentation by nondisclosure. Multistate contends that there are 31 different bar review course businesses competing with Multistate in California and that the term "our competition" did not identify Bar/Bri, Gilberts, or Harcourt in any particular. Multistate makes the further point that the district court refused to find Harcourt in contempt when it ran an ad indirectly referring to Multistate. As to this ad, what is sauce for the gander must be sauce for the goose. If Harcourt did not offend the decree by its indirect reference neither did Multistate.
 
 
 30
 The fourth ad, like the first two, unmistakably identifies the Harcourt course. The decree forbade disparaging statements but permitted "truthful, accurate and non-misleading comment" and in particular truthful statements that Multistate's program "is a valuable supplement to the Bar/Bri course and that Bar/Bri students find it beneficial." Multistate contends that there is no evidence that the letter was not truthful and that it does no more than say the Multistate course was in fact a good supplement to Bar/Bri. Multistate is correct. The district court erred in holding that this ad violated the decree.
 
 
 31
 The fifth ad, like the second, referred to the raw test scores on the 1991 MBE and that a majority of those taking it had prepared through Bar/Bri. It compared them misleadingly with the scaled test scores of Multistate students. It was a violation of the decree. As, in three of the five instances, Multistate violated the decree, the district court did not err in judging Multistate to be in contempt.
 
 Multistate's Attack on the Decree
 
 32
 Multistate, however, attacks the decree itself, urging that the decree violated the antitrust law. Multistate's obvious initial problem is that it appears to be bound by the decree and cannot now attack it. Multistate's answer is Davies v. Grossmont Union High School Dist., 930 F.2d 1390 (9th Cir.), cert. denied, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). In that case this court reversed a contempt finding against the appellant, who had sought public office on the school board in disregard of a settlement agreement, approved by a federal district court, not to seek public office with the board. Davies, however, is distinguishable in three respects. First, there is a substantial, if technical, difference. The district court in Davies had not issued an order directing by its terms that the parties abide by the settlement agreement. Id. at 1393 n. 3. Second, the waiver of the appellant's right to public office in Davies was held to be invalid because the government did not have a legitimate reason for asking him to give up the right. Id. at 1399. Third, and most important, enforcement of a settlement would have violated the appellant's "constitutional right to run for elective office and the constitutional right of the voters to elect him." Id. at 1396. The public interest in preserving the right of the people to elect their own representatives was held to outweigh any other consideration in the case.
 
 
 33
 As Davies does not apply, the ordinary rule holds that a party who has consented to a judgment and not moved to set it aside may not attack it on appeal. Tapper v. Commissioner of Internal Revenue, 766 F.2d 401, 403 (9th Cir.1985).
 
 
 34
 An award of attorney's fees for civil contempt is within the discretion of the district court. General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1380 (9th Cir.1986). Costs and attorney's fees were properly awarded to make Harcourt whole.
 
 
 35
 Multistate's Contempt Action against Harcourt; Rule 11 Sanctions
 
 
 36
 Multistate's motion to hold Harcourt in contempt failed because the district court (1) found that the Ohio Practice Institute was not a Harcourt franchisee bound by the consent decree, but only a licensee of Harcourt as to which Harcourt was bound only to use its best efforts to prevent violation of the decree; (2) that any evidence of oral disparagement by Brian Sax depended on Feinberg's report of Cynthia Williams' statement which was double hearsay and inadmissible as evidence; and (3) that Harcourt's informational brochure did not refer indirectly to Multistate when it said "historically the best rationale for most students taking a supplemental MBE workshop, etc." We cannot say that the district court committed clear error in any of these findings or an abuse of discretion in refusing to find Harcourt in contempt.
 
 
 37
 Multistate, however, did present some justification for its motion. It had in its possession a letter from Harcourt to the Ohio Practice Institute which described the relation between the two as that of franchiser and franchisee. As to the statements attributed to Brian Sax, Robert Feinberg was under the impression that Cynthia Williams was an employee of Harcourt and that her statements would be admissible as admissions by Harcourt. When counsel attempted to verify Harcourt's later statement that Williams was not an employee, counsel could not get her telephone number and Harcourt did not furnish it to him. The statement about the historical pattern of supplementing Bar/Bri appears to correspond to the other evidence in this case that Multistate was frequently used to supplement Bar/Bri and enjoyed a special role in that regard. It was not unreasonable for Multistate to argue that law school students would have understood the reference to be a disparaging one to Multistate.
 
 
 38
 For these reasons we are unable to agree with the district court that Multistate proceeded without a reasonably diligent inquiry into the facts or law. The district court also found that the complaint had been filed "probably" as a retaliation for this court's finding Multistate in contempt in October of 1992. In reaching this conclusion the court had before it merely the timing of Multistate's motion and the court's own view of the insubstantiality of Multistate's case. Moreover, a complaint that is non-frivolous is, objectively, not filed for an improper purpose. Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir.1990) (en banc). Consequently, the Rule 11 sanctions cannot be upheld.
 
 
 39
 AFFIRMED, except that the order imposing sanctions is REVERSED.